United States District Court
Southern District of Texas

**ENTERED**

September 14, 2021

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JILLIAN OSTREWICH, *et al.*, | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:19-cv-00715 |
| | § | |
| TENESHIA HUDSPETH, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me are competing motions for summary judgment. Having reviewed the briefing, the record, and the applicable law, I recommend that Plaintiff's Motion for Summary Judgment (Dkt. 74) be **GRANTED** in part and **DENIED** in part, and that Defendants' Motion for Summary Judgment (Dkt. 76) be **GRANTED** in part and **DENIED** in part.

## BACKGROUND

Jillian Ostrewich ("Ostrewich") filed this lawsuit alleging that she was unconstitutionally censored under Texas law when she went to vote wearing a Houston firefighter T-shirt during the 2018 election.[1] She also alleges that Texas law unconstitutionally "chills" her right to free speech by criminalizing political expression within polling places. Both state and local officials are defendants to this lawsuit, including: Texas Secretary of State, Ruth R. Hughs; Texas Attorney General, Ken Paxton; Harris County Clerk, Teneshia Hudspeth; and Harris County District Attorney, Kim Ogg.

---

[1] At the outset of this lawsuit, there were two plaintiffs: Ostrewich and Anthony Ortiz. On July 9, 2020, Ortiz filed a Stipulation of Dismissal, and Judge George C. Hanks, Jr., dismissed Ortiz's claims with prejudice the next day. *See* Dkt. 64.

### A.   THE FACTS

Until the early 2000s, Houston firefighters had pay parity with Houston police officers, but that ended when the police agreed to pension and benefit cuts in exchange for raises. Under that agreement, police salaries increased over time while firefighter salaries remained the same. By 2018, senior Houston firefighters earned 25 percent less than senior Houston police officers. After years of negotiation with Houston Mayor Sylvester Turner, the firefighters turned down a 9.5 percent salary increase and decided to take the issue to the voters. Having collected enough signatures on a citizen's initiative, Proposition B was placed on the ballot for the 2018 election. The proposal was to amend Houston's City Charter to read: "The City of Houston shall compensate firefighters in a manner and amount that is at least equal and comparable by rank and seniority with the compensation provided by City Police Officers." Mayor Turner campaigned against the proposition as an unsustainable drain on the City's financial resources. Not to be deterred, Houston firefighters organized around Proposition B and led "block walks" wearing yellow shirts provided by the AFL-CIO affiliated International Association of Firefighters:





Dkt. 76-1 at 164.



*Id.* at 165.

Ostrewich's husband, Mark, has served as a Houston firefighter for around two decades, and Ostrewich is a self-proclaimed "fire-wife." Approximately 12–18 months before the November 2018 election, Mark Ostrewich received two of the same yellow T-shirts from his union hall and gave one to his wife. Here is Ostrewich wearing her shirt:

 

Dkt. 1 at 16–17.

On October 24, 2018, Ostrewich and her husband went to vote during the early voting period at the Metropolitan Multi-Service Center located at 1475 West Gray Street (the "Polling Place"). *See id.* at 7–8. They were wearing their yellow T-shirts. Others stood outside the main entrance to the Polling Place, advocating support for Proposition B while wearing the same yellow T-shirts. The setting looked something like this:



Dkt. 76-5 at 4. This scene was common throughout the City of Houston during the 2018 election.



Houston firefighters are asking voters for yes votes for Prop B today at the Beall St.polling location. Thanks for the support, Houston!



Dkt. 76-1 at 166.

Inside the Polling Place, voting booths were stationed in various activity rooms, and a line formed along the North Hallway. Ostrewich entered the glass doors at the main entrance of the building and patiently waited in line for her turn to vote. The parties have stipulated that when Ostrewich reached the front of the

line, "an election worker told [Ostrewich] she could not wear the yellow firefighter T-shirt in the polling place." Dkt. 114 at 1. She was then directed to the women's restroom to turn her shirt inside out.

The parties have been unable to identify or otherwise locate the election worker that ordered Ostrewich to turn her shirt inside out, so Ostrewich's testimony is the only summary judgment evidence regarding what transpired there in the North Hallway. At deposition, Ostrewich testified that when she "got to the front of the line, and it was [her] turn to go in" to the rooms containing the voting booths, an election worker pointed to Ostrewich's shirt and said: "You are not going to be allowed to vote until you [flip your shirt inside out] because we're 'voting on that.'" Dkt. 76-1 at 72. Ostrewich requested no further explanation. Instead, she complied with the order, changed her shirt, returned to the line, and voted 10–15 minutes later.

On February 28, 2019, Ostrewich filed suit against state and local authorities alleging that three sections of the Texas Election Code violate the First Amendment to the United States Constitution. In the alternative, she alleges that those three provisions run afoul of the Fourteenth Amendment's due process clause because they are impermissibly vague. Ostrewich seeks a judicial declaration that those three provisions are unconstitutional and an injunction prohibiting Defendants from enforcing them. She also requests nominal damages.

## B.   TEXAS ELECTION LAW

The three statutory provisions at issue in this case are Texas Election Code §§ 61.003, 61.010, and 85.036.[2]

Section 61.003, titled "Electioneering and Loitering Near Polling Place," provides, in relevant part:

> (a)   A person commits an offense if, during the voting period and within 100 feet of an outside door through which a voter may

---

[2] I will collectively refer to these provisions as the "Electioneering Statutes."

enter the building in which a polling place is located, the person:

(1)   loiters; or

(2)   electioneers for or against any candidate, measure, or political party.

* * *

(b)   In this section:

(1)   "Electioneering" includes the posting, use, or distribution of political signs or literature. The term does not include the distribution of a notice of a party convention authorized under Section 172.1114.

(2)   "Voting period" means the period beginning when the polls open for voting and ending when the polls close or the last voter has voted, whichever is later.

(c)   An offense under this section is a Class C misdemeanor.

TEX. ELEC. CODE § 61.003.

Section 61.010, titled "Wearing Name Tag or Badge in Polling Place," provides, in relevant part:

(a)   Except as provided in Subsection (b), a person may not wear a badge, insignia, emblem, or other similar communicative device relating to a candidate, measure, or political party appearing on the ballot, or to the conduct of the election, in the polling place or within 100 feet of any outside door through which a voter may enter the building in which the polling place is located.

(b)   An election judge, an election clerk, a state or federal election inspector, a certified peace officer, or a special peace officer appointed for the polling place by the presiding judge shall wear while on duty in the area described by Subsection (a) a tag or official badge that indicates the person's name and title or position.

(c)   A person commits an offense if the person violates Subsection (a). An offense under this subsection is a Class C misdemeanor.

Id. § 61.010.

Section 85.036, titled simply "Electioneering," provides, in relevant part:

7

(a)    During the time an early voting polling place is open for the conduct of early voting, a person may not electioneer for or against any candidate, measure, or political party in or within 100 feet of an outside door through which a voter may enter the building or structure in which the early voting polling place is located.

*  *  *

(d)    A person commits an offense if the person electioneers in violation of Subsection (a).

(e)    An offense under this section is a Class C misdemeanor.

(f)    In this section:

(1)    "Early voting period" means the period prescribed by Section 85.001.

(2)    "Electioneering" includes the posting, use, or distribution of political signs or literature.

*Id.* § 85.036. Sections 61.003 and 85.036 are almost verbatim copies of each other. The only difference is that section 61.003 applies on election day and section 85.036 applies during the early voting period.

People who violate any of these provisions may be charged with a Class C misdemeanor by the Attorney General or local prosecutors. *See id.* §§ 273.021–273.022. Criminal investigations into alleged violations can be initiated in several ways. First, receipt of two or more affidavits by registered voters alleging violations of the Election Code triggers an obligatory investigation by local authorities. *See id.* § 273.001(a). Second, the Secretary of State can refer complaints to the Attorney General for criminal investigation. *See id.* § 273.001(d) (citing *id.* § 31.006). Finally, the Attorney General and local prosecutors have authority to initiate criminal investigations at their discretion. *See id.* § 273.001(b). Although criminal prosecution is authorized, no one has been charged with a criminal violation of the Electioneering Statutes in at least a decade. *See* Dkt. 76 at 14 (citing interrogatory answers provided by Paxton and Ogg).

Beyond criminal prosecution, these statutes are also enforced at the ground level by election judges monitoring the polling places. *See* TEX. ELEC. CODE § 32.075(a) ("The presiding judge shall preserve order and prevent . . . violations of

8

this code in the polling place and in the area within which electioneering and loitering are prohibited."). Election judges have "the power of a district judge to enforce order and preserve the peace, including the power to issue an arrest warrant." *Id.* § 32.075(b). But their discretion is guided by the Secretary of State and local election officials, like the Harris County Clerk. *See id.* § 32.111(a) (directing the Secretary of State to develop a standardized training curriculum for election judges and clerks); § 32.114 (directing local election officials to provide training sessions using the Secretary of State's programs and materials). An election judge who "causes a disruption in a polling location or willfully disobeys the provisions of" the Texas Election Code can be removed, replaced, or reassigned. *Id.* § 32.002(g).

## C.   *MINNESOTA VOTERS ALLIANCE v. MANSKY*, 138 S. CT. 1876 (2018)

This section explores in detail the Supreme Court's recent decision in *Mansky*, a case in which the high court struck down a Minnesota statute similar to the Texas statutes at issue here. Among other prohibitions, the Minnesota statute forbid people from wearing a "political badge, political button, or other political insignia . . . at or about the polling place on primary or election day." MINN. STAT. ANN. § 211B.11. Election judges working at polling places throughout Minnesota were responsible for determining whether a particular item was "political" and, therefore, banned by the statute.

During the 2010 election, election workers in Minnesota turned away several Minnesota voters because they were wearing buttons that said "Please I.D. Me" and T-shirts "with the words 'Don't Tread on Me' and the Tea Party Patriots logo." *Mansky*, 138 S. Ct. at 1884. Those voters filed a lawsuit alleging that the Minnesota statute violated the Free Speech Clause of the First Amendment to the United States Constitution. The Supreme Court considered the merits of the case in two parts.

The Supreme Court first recognized that "[a] polling place in Minnesota qualifies as a nonpublic forum." *Id.* at 1886. Because the provision at issue did not

"discriminate[] on the basis of viewpoint on its face," the Court then considered whether the ban on political apparel was "reasonable in light of the purpose served by the forum: voting." *Id.* (quotation omitted). The Court held that the statute was unreasonable because it did not provide "objective, workable standards" to guide the discretion of election judges who were responsible for determining whether a particular item should be banned as "political." *Id.* at 1891. In other words, the State failed to "articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888. Central to this conclusion was the statute's "unmoored use of the term 'political'" and the "haphazard interpretations" of the law supplied by Minnesota officials in its 2010 Election Day Policy. *Id.* Minnesota's 2010 Election Day Policy provided five examples of apparel that qualified as sufficiently "political" under the law to justify enforcement by an election judge. The first three explained that election judges could prohibit "items displaying the name of a political party, items displaying the name of a candidate, and items demonstrating support of or opposition to a ballot question." *Id.* at 1889 (quotation omitted). The Court found these three examples "clear enough," but the next two were troubling. *Id.*

The fourth example was problematic because it advised election judges to prohibit apparel commenting on "any subject on which a political candidate or party has taken a stance." *Id.* This example was unreasonable, the Court explained, because it "require[d] an election judge to maintain a mental index of the platforms and positions of every candidate and party on the ballot." *Id.* The second problematic example allowed election judges to ban "any item promoting a group with recognizable political views." *Id.* at 1890 (quotation omitted). The Court found this example unreasonable because "[a]ny number of associations, educational institutions, businesses, and religious organizations could have an opinion on an 'issue[ ] confronting voters in a given election.'" *Id.* (explaining that whether particular apparel was prohibited under the apparel ban for promoting a group with recognizable political views "turn[ed] in significant part on the

background knowledge and media consumption of the particular election judge applying it").

In short, while recognizing that it was necessary to afford election judges "some degree of discretion," the Court held that the Minnesota law was unreasonable because it was not "capable of reasoned application"—i.e., it failed to reign in the discretion of election judges by reference to meaningful standards. *Id.* at 1891–92.

## SUBJECT-MATTER JURISDICTION

Defendants first challenge the jurisdiction of this Court. Before addressing that argument, I merely note that the Supreme Court in *Mansky* proceeded to the case's merits without addressing subject-matter jurisdiction. Given the similarity between this case and *Manksy*, it is unlikely that subject-matter jurisdiction is lacking here. *See Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 820 n.9 (5th Cir. 1979) (citing *Hynes v. Mayor of Oradell*, 425 U.S. 610 (1976) as reinforcing the conclusion that the district court had jurisdiction over the claims because the Supreme Court issued a ruling on the merits). Nonetheless, out of an abundance of caution, I address subject-matter jurisdiction at length here.

"Federal courts are courts of limited jurisdiction." *La. Real Est. Appraisers Bd. v. Fed. Trade Comm'n*, 917 F.3d 389, 391 (5th Cir. 2019) (quotation omitted). To determine the limits of that jurisdiction, "federal courts must look to the sources of their power, Article III of the United States Constitution and congressional statutory grants of jurisdiction." *Tercero v. Tex. Southmost Coll. Dist.*, 989 F.3d 291, 298 (5th Cir. 2021). Article III of the Constitution empowers federal courts to hear "cases" or "controversies" arising under the Constitution. U.S. CONST. art. III, § 2. Defendants argue that jurisdiction is lacking here and ask me to consider: (1) whether Ostrewich has standing to sue; (2) whether her claim is moot; and (3) whether her claim is ripe for adjudication. *See Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) ("The justiciability doctrines of standing, mootness, . . . and ripeness all originate in Article III's case or controversy

language." (quotation omitted)). Paxton and Hughs further argue that, at a minimum, they should be dismissed from this suit under the Eleventh Amendment's sovereign-immunity doctrine.

## A.   STANDING

There is no case or controversy if the plaintiff does not have standing to sue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing, an individual bears the burden of "satisfy[ing] the trifecta of standing: injury in fact, causation, and redressability." *Voting for Am., Inc. v. Andrade*, 888 F. Supp. 2d 816, 827 (S.D. Tex. 2012). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). "[C]ausation and redressability will exist when a defendant has 'definite responsibilities relating to the application of' the challenged law." *Voting for Am.*, 888 F. Supp. 2d at 831 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)).

### 1.   Ostrewich has standing to sue Hughs and Hudspeth.

In the First Amendment context, a plaintiff can establish an injury in fact by showing that she was subjected to an enforcement action under the allegedly unlawful statute. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020).

It is undisputed that an election worker told Ostrewich to turn her yellow firefighter T-shirt inside out. Defendants argue that this is not an injury in fact because enforcement of the statute does not occur unless a voter is prevented from voting, arrested by the police, or prosecuted by state or local authorities. For example, Defendants contend that "the sole consequence for violating these statutes is that such conduct constitutes a Class C misdemeanor." Dkt. 94 at 10. I reject this position because it diminishes the significance of an election judge's legal authority to unilaterally order an individual voter to remove or cover up articles of expressive clothing within 100 feet of a polling place—as was done here. Because Ostrewich was ordered to refrain from self-expression by an election

worker acting under color of state law, she has unquestionably suffered an injury in fact for purposes of Article III standing.

Ostrewich's injury is fairly traceable to Hughs and Hudspeth because they have "definite responsibilities relating to the application of the challenged law." *LeBlanc*, 627 F.3d at 124. For example, as Secretary of State, Hughs is responsible for "adopt[ing] standards of training in election law and procedure for presiding or alternate election judges" and "develop[ing] materials for a standardized curriculum for that training." TEX. ELEC. CODE § 32.111(a)(1)–(2). Moreover, Keith Ingram, the Secretary of State's Election Division Director, testified that election judges have a duty to enforce the Election Code as interpreted by the Secretary of State's office. *See* Dkt. 74-6 at 16. Beyond developing a training regime for election judges, Hughs also "assist[s] and advise[s] all election authorities with regard to the application, operation, and interpretation of the [Texas Election Code]," including the provisions at issue in this case. TEX. ELEC. CODE § 31.004(a); *see also id.* § 31.003 (mandating that the Secretary of State maintain a uniform application of the Election Code and requiring the Secretary of State to "prepare detailed and comprehensive written directives and instructions" and "distribute these materials to the appropriate state and local authorities" responsible for their administration).

As the Chief Deputy of the Harris County Clerk's Office, Hudspeth "plays a role in the selection and appointment of election judges." Dkt. 74-8 at 27. *See also* TEX. ELEC. CODE § 32.002(c-1)–(e). Accordingly, Hudspeth has authority to "remove, replace, or reassign an election judge who causes a disruption in a polling location or wil[l]fully disobeys" the Election Code's provisions. *Id.* § 32.002(g). Hudspeth is also responsible for training election judges "using the standardized training program and materials developed by" the Secretary of State. *Id.* § 32.114(a).

Ostrewich suffered an injury when an election worker enforcing the Electioneering Statutes ordered her to turn her shirt inside out. This injury is

traceable to Hughs and Hudspeth because they are responsible for training the election judges, keeping them informed, and overseeing their enforcement of the Election Code. An order enjoining Hughs and Hudspeth from enforcing the Electioneering Statutes would redress Ostrewich's injury. Ostrewich has standing to sue Hughs and Hudspeth.

### 2. Ostrewich has standing to sue Paxton and Ogg.

A person who violates the Electioneering Statutes commits a Class C misdemeanor. *See id.* §§ 61.003(c), 61.010(c), and 85.036(e). Although Ostrewich was never investigated for criminal conduct or charged with a criminal violation, the Supreme Court has held that the threat of enforcing a law that infringes on the right to free speech can satisfy the injury-in-fact requirement. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). That's because "[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Houston Chron. Pub. Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007). In this pre-enforcement posture, the Fifth Circuit has explained:

> A plaintiff has suffered an injury in fact if he (1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial.

*Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (cleaned up).

**Intention to engage in a course of conduct arguably affected with a constitutional interest:** At her deposition, Ostrewich testified that she would like to wear the yellow firefighter T-shirt to the polls again but is afraid to do so for fear of criminal prosecution. *See* Dkt. 74-1 at 16. Ostrewich's intended future conduct to wear expressive apparel to the polls clearly implicates a constitutional interest in freedom of speech and association. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) ("Because petitioners' intended future conduct

concerns political speech, it is certainly affected with a constitutional interest." (quotation omitted)).

**Intended future conduct is arguably proscribed by the policy in question:** Defendants contend that even if Ostrewich did wear the shirt, "there is no evidence to suggest that her yellow shirt will constitute electioneering in any future elections." Dkt. 76 at 23. In other words, Defendants take issue with whether Ostrewich can show that her intended future conduct will violate the Electioneering Statutes. This argument misses the mark because "a plaintiff who wishes to challenge the constitutionality of a law [does not have] to confess that he will in fact violate the law." *Driehaus*, 573 U.S. at 164. Indeed, Ostrewich had no intention of violating Texas' political-apparel ban in 2018 when she wore her yellow T-shirt—which expressed only general support for "Houston Fire Fighters" and did not mention Proposition B—and yet her shirt did violate the law. It is arguable that her apparel may do so again. Ostrewich has satisfied the first two elements.

**The threat of future enforcement of the challenged policies is substantial:** The third element is tricky. Nothing in the summary judgment record shows that people have been charged with violating the Electioneering Statutes in the past. *Cf. Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660–61 (5th Cir. 2006) (finding a credible threat of future enforcement based on a history of prior enforcement). For example, the record does not contain an opinion from the Office of the Attorney General that demonstrates the State's intention to charge or prosecute apparel-ban violators in the future. There is also nothing in the summary judgment record showing that Ostrewich was threatened with arrest or prosecution. *Cf. Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding credible threat of prosecution where "specific provisions of state law which have provided the basis for threats of criminal prosecution"); *Houston Chron. Pub. Co.*, 488 F.3d at 618 (same). Still, the Supreme Court in *Mansky* proceeded to the merits even though no one had ever been prosecuted for violating

Minnesota's electioneering statute. *See Manksy*, 138 S. Ct. at 1887 (Sotomayor, J., dissenting). I believe it is proper to address the argument in full.

The Supreme Court in *Driehaus* found a substantial threat of prosecution where the plaintiff had been found to have already violated a criminal statute, where other violations had been prosecuted before, and where the statute allowed "any person with knowledge of the purported violation to file a complaint" with the Ohio Election Commission. *Driehaus*, 573 U.S. at 164 (quotation omitted). The Court explained that "[b]ecause the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents." *Id.*

Although there is no summary judgment evidence showing that people have been prosecuted for violating the Electioneering Statutes, there is evidence in the record showing that people have been *arrested* for violating the political-apparel ban and refusing to comply with an election judge's order. *See* Dkt. 86 at 6. Texas law also requires local authorities to investigate any claimed violation of the Election Code supported by the affidavits of two registered voters. *See* TEX. ELEC. CODE § 273.001(a). In other words, there is a credible threat that Ostrewich could: (1) be arrested at a polling place for violating the apparel ban; or (2) be criminally investigated based on complaints by third parties who are not "constrained by explicit guidelines or ethical obligations." *Driehaus*, 573 U.S. at 164. Additionally, as the Fifth Circuit explained just a few days ago, a district court "may assume a substantial threat of future enforcement absent compelling contrary evidence." *Barilla v. City of Houston*, --- 4th ---, 2021 WL 4128835, at *4 (5th Cir. Sept. 10, 2021). Finally, I must note that, although Paxton and Ogg have not prosecuted any violations of the Texas Election Code, they have never disavowed their authority to do so nor otherwise affirmatively represented that they will not prosecute violations going forward. *See id.* at *5 (finding a substantial threat of enforcement where the City of Houston did not disclaim its intent to enforce the Ordinances in

dispute, "and instead stressed the Ordinances' legitimacy and necessity"); *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016) ("We have also taken into consideration a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."). For these reasons, I find a credible threat that Ostrewich may face criminal sanctions under the political-apparel bans. Ostrewich has standing to sue Paxton and Ogg for her pre-enforcement "chilling" injury.

## B.   MOOTNESS

A federal court has no jurisdiction to resolve a moot claim because a moot claim "presents no Article III case or controversy." *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999). The Supreme Court has described mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quotation omitted). Simply stated, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). *See also Ctr. for Individual Freedom*, 449 F.3d at 661 ("Generally, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot.").

Although mootness is a bar to federal jurisdiction, the Supreme Court has recognized an exception for "attacks on practices that no longer directly affect the attacking party, but are 'capable of repetition' while 'evading review.'" *Alvarez v. Smith*, 558 U.S. 87, 93 (2009). Ostrewich argues that the "capable of repetition while evading review" exception applies here. To successfully invoke the exception, Ostrewich must show: "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)

17

(quotation omitted). As discussed below, Ostrewich's claim evades review and is capable of repetition. Therefore, her claim, although possibly moot in the traditional sense, is still justiciable.

### 1. Enforcement of Texas's political apparel ban evades review.

In analyzing the first element—whether the challenged conduct evades review—the Fifth Circuit has explained that "[c]laims need to be judged on how quickly relief can be achieved in relation to the specific claim." *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370 (5th Cir. 2020). The challenged action here is an election worker's enforcement of allegedly unconstitutional Texas statutes that ban political apparel at polling places.

Ostrewich alleges that an authorized election worker enforced the statutes against her and presented Ostrewich with a choice: either turn her yellow T-shirt inside out or forfeit her right to vote. According to Defendants, Ostrewich's claim became moot as soon as she complied with the order, changed her shirt, and cast her vote. Under this view, the challenged conduct is too short in duration to be fully litigated prior to the cessation of the challenged conduct. Nonetheless, Defendants argue that the challenged conduct is not too short in duration to obtain review because Ostrewich could have obtained relief by (1) requesting an official ruling from the presiding election judge and (2) appealing that decision to a Texas appellate court. *See* Dkt. 94 at 17 (citing TEX. ELEC. CODE § 32.075(c)). But Ostrewich's claim is that the election worker had no constitutional authority to enforce the statute to begin with. Ostrewich isn't challenging the election worker's order; she's challenging the statute that authorizes election workers to enforce a political-apparel ban that she alleges runs afoul of the First and Fourteenth Amendments. Ostrewich is asking for a district court order declaring the Electioneering Statutes unconstitutional. Nothing in the briefing suggests that the presiding election judge had any authority or discretion to offer that kind of relief. *Cf*. TEX. ELEC. CODE § 32.002(g) ("[T]he county clerk may remove, replace, or reassign an election judge who . . . willfully disobeys the provisions of this code.");

18

Dkt. 74-6 at 16 (Texas Secretary of State Election Division Director explaining that election judges "take an oath to uphold the Election Code," and must comply when the Secretary of State "tell[s] them that the Election Code requires something."). Even if an election judge could have officially ruled on the constitutionality of the Electioneering Statutes, Ostrewich could not have exercised her right to appeal that decision before casting her ballot. Ostrewich's claim evades review.[3] The first element is satisfied.

### 2. Ostrewich's alleged injury is capable of repetition.

To invoke the "capable of repetition while evading review" exception, Ostrewich must also show that "there is a reasonable expectation" that she "will be subject to the same action again." *Wis. Right to Life*, 551 U.S. at 462 (quotation omitted). The Fifth Circuit has explained that it is "unwilling to dismiss a case as moot when the issues properly presented, and their effects will persist as the restrictions are applied in future elections." *Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009) (cleaned up). So, even if Defendants are correct that Ostrewich "has no specific plans to wear her yellow shirt to vote ever again" or that she has no plans to engage in electioneering in the future, Dkt. 76 at 22, Ostrewich's claim is still not moot. *See Moore*, 591 F.3d at 744 (holding "the case was not moot because

---

[3] Defendants argue that *Empower Texans* supports their position, but I disagree. The challenged conduct at issue in *Empower Texans* was that the Chairman of the Committee on House Administration of the Texas House of Representatives, Charlie Geren, had delayed in ruling on Empower Texans' media-pass applications, which effectively denied its reporters access to the House Floor. *See Empower Texans*, 977 F.3d at 369. The district court dismissed the complaint four days before the end of the regular legislative session. *See id.* at 372. The Fifth Circuit declined to rule on the merits and dismissed the case as moot because the regular legislative session had ended while the appeal was pending and "the possibility of a special session ha[d] all but vanished." *Id.* at 370. The Fifth Circuit noted that Empower Texans could have obtained review of the challenged conduct if it had used those four days to file an expedited notice of appeal. *See id.* (citing FED. R. APP. P. 2; 5th CIR. R. 27.5). But Empower Texans failed to do so. It waited nearly 30 days before filing a notice of appeal, the legislative session ended, and Empower Texans' claim became moot. That's not the case here.

other individuals certainly would be affected by the continuing existence of the statute" (cleaned up)).

Ostrewich alleges that Texas' political-apparel ban is unconstitutional. She alleges that she suffered a constitutional injury when an election worker enforced the statute against her. Defendants do not dispute that election workers will continue to enforce the Electioneering Statutes in the future. Thus, there is a reasonable expectation that the alleged constitutional violation will happen again. Because Ostrewich has successfully invoked the "capable or repetition, yet evading review" exception to the mootness doctrine, her claim is justiciable under Article III.

## C.   RIPENESS

"[T]o be a case or controversy for Article III jurisdictional purposes, the litigation must be ripe for decision, meaning that it must not be premature or speculative." *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 922 (5th Cir. 2017) (quotation omitted). The Fifth Circuit has explained:

> A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical. The key considerations are the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required. However, even where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness.

*Choice Inc. of Tex.*, 691 F.3d at 715 (cleaned up).

Defendants argue that Ostrewich's claims are not ripe for adjudication because she "has no specific plans to wear a yellow shirt to vote again,"[4] and "there is no evidence to suggest that her yellow shirt will constitute electioneering in any future election." Dkt. 76 at 23. But that is of no moment. The issues presented in

---

[4] Ostrewich testified at her deposition that she would like to wear the T-shirt to the polling place in future elections but has no specific plans to do so because she does not "know if it's legal to wear that T-shirt into a voting location." Dkt. 76-1 at 82.

this case are purely legal questions: (1) whether the political-apparel ban was constitutionally applied to Ostrewich's yellow T-shirt; and (2) whether the political-apparel ban is unconstitutional on its face. No further factual development is required to pass judgment. As discussed above, Ostrewich suffered an injury both when an election worker enforced the political-apparel ban against her and from the overall chilling of her right to free speech and association. As Ostrewich points out, "Texas voters will continue to wear expressive apparel to polling places," and "[e]lection judges will continue to enforce the electioneering statutes against them." Dkt. 92 at 18. There is no speculation required to see that the statute bans political speech. The risk that the Electioneering Statutes unconstitutionally abridge the First Amendment rights of Texans is not hypothetical. This case is ripe.

## D. SOVEREIGN IMMUNITY

Paxton and Hughs argue that Ostrewich's claims against them should be dismissed under the doctrine of sovereign immunity. The Eleventh Amendment presupposes "that each State is a sovereign entity in our federal system" and "that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Alden v. Maine*, 527 U.S. 706, 729 (1999) (cleaned up). Eleventh Amendment sovereign immunity also "prohibits suits against state officials or agencies that are effectively suits against a state." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). Aside from obtaining the sovereign's consent to litigate, a state's sovereign immunity can be abrogated by the United States Congress under Section V of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). The State of Texas has not consented to this suit, and Congress has not abrogated the State's immunity on this issue. To overcome sovereign immunity then, Ostrewich must fit her claim into an exception to the doctrine.

One exception dates back over 100 years. *See Ex Parte Young*, 209 U.S. 123, 157 (1908). "The *Young* exception is a legal fiction that allows private parties to

bring suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *City of Austin*, 943 F.3d at 997 (quotation omitted). To determine whether the *Ex Parte Young* exception applies, courts must consider: (1) whether the named defendants are proper; (2) "whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"; and (3) "whether the official in question has a sufficient connection to the enforcement of the challenged act." *Id.* at 998 (quotations omitted). The parties devote their briefing to whether the third element has been satisfied.[5]

The third element is a source of confusion throughout the Fifth Circuit and even among the Circuit's panels. *See, e.g., Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400 n.21 (5th Cir. 2020) ("Our decisions are not a model of clarity on what 'constitutes a sufficient connection to enforcement.'" (quoting *City of Austin*, 943 F.3d at 999)). The parties offer *City of Austin* as a case that might shed light on the issue, but I'm not so sure. The problem with *City of Austin* is that it seems to conflate elements one and three. *Compare* 943 F.3d at 998 ("Attorney General has the authority to enforce" the challenged statute), *with id.* at 1000 n.1 (noting that "this is an odd type of enforcement authority"), *id.* at 1001 (explaining that Attorney General's ability to intervene in a lawsuit and enforce state law has no "overlapping facts with this case [and is not] even remotely related to the

---

[5] Paxton and Hughs are proper defendants because they have the authority to enforce the Texas Election Code. *See City of Austin*, 943 F.3d at 998. Paxton has the authority to criminally charge and prosecute people who violate the Election Code. Hughs has the authority to interpret the Election Code, train election judges on how to enforce the Election Code, and refer complaints to the Attorney General for criminal investigation. *See* Tex. Elec. Code §§ 273.001(b), 273.001(d), and 273.021–273.022.

It is also clear that Ostrewich's complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. *See* Dkt. 1 at 10–14 (alleging constitutional violations and seeking declaratory relief, injunctive relief, and nominal damages); *LeBlanc*, 729 F.3d at 439 ("A suit is not 'against' a state" for purposes of sovereign immunity "when it seeks prospective, injunctive relief from a state actor, in her official capacity, based on an alleged ongoing violation of the federal constitution.").

ordinance"), *and id.* at 1002 (finding not even a "scintilla of enforcement" by the Attorney General). Indeed, the Fifth Circuit held "that Attorney General Paxton is not subject to the *Ex Parte Young* exception because our *Young* caselaw requires a higher showing of 'enforcement' than the City has proffered here." *Id.* at 1000. If that's right, *City of Austin* has more to do with an inquiry into whether the first element has been satisfied, not the third.

Different panels writing for the Fifth Circuit have recognized at least three ways in which the third element's sufficient-connection requirement can be established. First, Ostrewich can put forth some evidence showing that Paxton and Hughs have some authority to compel compliance with the law or constrain a person's ability to violate the law. *See Tex. Democratic Party*, 961 F.3d at 401. Ostrewich could also provide some evidence showing that Paxton and Hughs have a duty to enforce the statute in question and a "demonstrated willingness" to enforce the statutes. *Id.* (quotation omitted). Finally, Ostrewich can demonstrate a sufficient connection by putting forth evidence showing "some scintilla of affirmative action by the state official." *Id.* (quotation omitted). Put another way, if an "official can act, and there's a significant possibility that he or she will, the official has engaged in enough compulsion or restraint to apply the *Young* exception." *Id.* (cleaned up).

Both Paxton and Hughs can act to enforce the ban on wearing political apparel to polling places during early voting and on election day. *See* Tex. Elec Code §§ 273.001(b), (d), and 273.021–273.022. But that's not enough. Ostrewich must put forward some evidence showing at least a "scintilla of affirmative action by" Paxton and Hughs. *Tex. Democratic Party*, 961 F.3d at 401 (quotation omitted). As Chief Election Officer for the State, Hughs is responsible for training election judges to enforce the law as interpreted by the Election Division. *See* Dkt. 76-1 at 23 (explaining that election judges are duty-bound to enforce the law as interpreted by the Secretary of State). The summary judgment record shows that

23

Hughs issued an Election Advisory on June 18, 2020,[6] in which Hughs advised "County Clerks/Elections Administrators and County Chairs," Dkt. 85-1 at 99, that they should instruct election judges to enforce the Electioneering Statutes against voters "wearing a face mask that qualifies as electioneering for or against any candidate, measure, or political party." *Id.* at 105. This is a sufficient connection to enforcement for purposes of piercing the State's sovereign immunity with respect to Hughs. *See Tex. Alliance for Retired Americans v. Hughs*, 489 F. Supp. 3d 667, 684 (S.D. Tex. 2020). Defendants argue that the Secretary of State has no role in enforcing the Electioneering Statutes because the presiding election judge has "the exclusive authority . . . to enforce the Texas Electioneering Laws." Dkt. 94 at 18. That may be true, but their discretionary decision making is guided by interpretations issued by the Secretary of State under threat of removal.

The Texas Election Code authorizes Paxton to enforce the challenged statutes. *See* TEX. ELEC. CODE § 273.001, 273.021(a). The question is whether Paxton has a "demonstrated willingness" to exercise his discretion in enforcing the Election Code or whether there is a "significant possibility" that he will exercise that discretion. *Tex. Democratic Party*, 961 F.3d at 401. In response to interrogatories, Paxton answered that his office "has not prosecuted any alleged violations [of the Electioneering Statutes] within the past ten years." Dkt. 76-6 at 15. But "a history of enforcement is [not] required to establish a sufficient connection," *Langan v. Abbott*, 518 F. Supp. 3d 948, 953 (W.D. Tex. 2021), and there is nothing in the summary judgment record suggesting that Paxton will not prosecute violators in the future. I am unwilling to look at an absence of past enforcement activity and conclude that there is no threat of future enforcement activity, especially where the threat of future enforcement poses a serious risk of chilling political speech. Paxton is authorized to enforce statutes that Ostrewich

---

[6] Although this Election Advisory was issued two years after Ostrewich filed this lawsuit, it demonstrates that the Secretary of State has the authority to instruct election judges on how to enforce the Electioneering Statutes and is willing to exercise that authority.

alleges are unconstitutional, and the threat of prosecution chills political speech. Paxton's ability to directly enforce the statutes is a sufficient connection to invoke the *Ex Parte Young* exception to the sovereign immunity doctrine.[7]

## SUMMARY JUDGMENT

Having determined that I have jurisdiction to hear this case, I can now turn to the ultimate merits of the dispute. A party should prevail on a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] facial challenge to the constitutionality of a statute presents a pure question of law," so summary judgment will be appropriate one way or another because there are no facts that need to be resolved. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006). As for Ostrewich's as-applied challenge to the statutes, the material facts are not in dispute, so summary judgment is appropriate.

The First Amendment's prohibition against laws "abridging the freedom of speech" has been incorporated against the states under the Fourteenth Amendment. *See Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). The Electioneering Statutes plainly restrict an individual's speech, but the ban applies only to the interior of a polling place and

---

[7] Ostrewich's complaint seeks both an injunction and nominal damages. However, her claim for nominal damages against Paxton and Hughs is clearly impermissible under the *Ex Parte Young* exception and should be dismissed. *See Arizonans for Official English*, 520 U.S. at 69 n.24 (The *Ex Parte Young* "doctrine, however, permits only prospective relief, not retrospective monetary awards."); *Connolly v. Roche*, No. 2:14-cv-00024 JWS, 2014 WL 12550553, at *3 (D. Ariz. July 30, 2014) ("The doctrine of *Ex Parte Young* permits claims against state officials in federal courts for prospective relief such as a declaratory judgment or an injunction. It does not apply to retroactive relief such as a claim for damages.").

"within 100 feet of any outside door through which a voter may enter the building in which the polling place is located." TEX. ELEC. CODE §§ 61.003, 61.010(a), and 85.036(a). This type of provision triggers the "forum based approach for assessing restrictions that the government seeks to place on the use of its property." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (quotation omitted).

As discussed, the parties have stipulated that Ostrewich was inside a polling place when an election worker stopped her and ordered her to turn her shirt inside out. The Supreme Court has held that a polling place is a nonpublic forum, where the government may regulate speech "as long as the regulation on speech is reasonable." *Mansky*, 138 S. Ct. at 1885 (quotation omitted). Ostrewich argues that the Electioneering Statutes were unreasonably applied to her and that they are incapable of reasonable application in any circumstance because they are overbroad or vague. In other words, she challenges the Electioneering Statutes as applied and on their face. I must analyze the Electioneering Statutes individually to determine whether they pass constitutional muster.

## A.   SECTION 61.010

### 1.  Ostrewich's as-applied challenge to section 61.010 fails.

I address Ostrewich's as-applied challenge first "because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (2019). A constitutional statute may be "invalid as applied when it operates to deprive an individual of a protected right." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). The "standard for an as-applied challenge is no different than the standard for a facial challenge." *Jornales de las Palmas v. City of League City*, 945 F. Supp. 2d 779, 798 (S.D. Tex. 2013). States may regulate speech in a polling place during the voting period "as long as the regulation on speech is reasonable." *Mansky*, 138 S. Ct. at 1885 (quotation omitted). Thus, the question is whether section 61.010 provided a reasonable basis for an election judge to prohibit Ostrewich from wearing her yellow T-shirt inside the polling place during the 2018 mid-term election.

As noted, section 61.010 prohibits voters from "wear[ing] a badge, insignia, emblem, or other similar communicative device relating to a candidate, measure, or political party appearing on the ballot, or to the conduct of the election" in a polling place or within 100 feet of one. TEX. ELEC. CODE § 61.010(a).[8] This provision is broad enough to permit election judges to prohibit T-shirts and other apparel, *see Mansky* 138 S. Ct. at 1883 (construing prohibition on wearing a "political badge, political button, or other political insignia" as applying to political apparel), but it is narrower than the Minnesota law challenged in *Manksy* because it prohibits apparel only if it "relat[es] to a candidate, measure, or political party *appearing on the ballot*." TEX. ELEC. CODE § 61.010(a) (emphasis added). *Cf. Mansky*, 138 S. Ct. at 1888 ("[T]he unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to this Court" is incapable of reasonable application.").

Defendants argue that the election judge had a reasonable basis for prohibiting Ostrewich's shirt because it was part of a massive grassroots campaign to encourage Houston-area residents to vote in favor of Proposition B—a measure that appeared on the 2018 ballot. As discussed earlier, advocates wore the same yellow T-shirt to campaign for Proposition B in neighborhoods and at polling places throughout the City of Houston. *See* Dkt. 76-1 at 99–101 (Ostrewich testifying that Proposition B supporters campaigned in the same yellow T-shirts at the Polling Place on the day she voted.). Ostrewich testified that she and her husband wore the T-shirt to the Polling Place to vote because she was excited that "[they] were finally getting to vote on Proposition B," and that it was the only

---

[8] Although Ostrewich voted during the early voting period, which is governed by Title 7 of the Texas Election Code (§§ 81.001–114.008), section 61.010 also applies during the early voting period. *See* TEX. ELEC. CODE § 81.002 ("The other titles of this code apply to early voting except provisions that are inconsistent with this title or that cannot feasibly be applied to early voting.").

Houston fire department T-shirt she owned. Dkt. 76-1 at 57–58. *See also id.* at 84. According to Ostrewich, she had made it to the front of the line in the North Hallway and was about to enter the room containing the voting booths when an election worker pointed to Ostrewich's shirt and told her "[y]ou are not going to be allowed to vote until you [flip your shirt inside out] because we're 'voting on that.'" *Id.* at 72. Ostrewich testified that she believed the worker was referring to the "fact that there was a firefighter measure on the ballot, Proposition B." *Id.* at 74. She did not ask for further explanation or otherwise challenge the election worker's request. Instead, Ostrewich proceeded to the restroom and turned her shirt inside out before voting 10 to 15 minutes later.

It is undisputed that the shirt was used by advocates throughout the City of Houston to campaign in favor of Proposition B in the months leading up to the 2018 election, and it is undisputed that campaigners wore the shirts at Houston-area polling places to campaign in favor of Proposition B. The fact that Ostrewich was not actively campaigning inside the polling place while wearing the yellow shirt is irrelevant. *See Mansky*, 138 S. Ct. at 1887 (rejecting this exact argument and distinguishing "the unique context of a polling place on Election Day" from other cases where the Court's "decisions have noted the 'nondisruptive' nature of expressive apparel in more mundane settings." (citing *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 567 (1987) (T-shirt in an airport); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969) (black armbands at school to protest Vietnam War)). The same can be said of the fact that the shirt does not explicitly say "Vote for Proposition B." As the Court noted in *Mansky*, the State's interest in preventing partisan discord at the voting booth "may be thwarted by displays that do not raise significant concerns in other situations." *Id.* at 1888.

Ostrewich argues that section 61.010 was not reasonably applied to her because of an email from the Harris County Administrator of Elections, Sonya Aston, sent the day after Ostrewich voted. *See* Dkt. 74 at 9. In that email, Aston advised local authorities that election judges should "allow people wearing non-

28

proposition supporting/opposing t-shirts to come in without covering up their t-shirts." Dkt. 74-4 at 39. According to Ostrewich, it was unreasonable to ban her shirt one day but allow the shirt another day. I disagree. The question in an as-applied challenge is whether haphazard enforcement of a statute prejudiced the plaintiff raising the claim. Section 61.010 clearly authorized the election judge to prohibit Ostrewich from wearing her yellow T-shirt in the polling place during early voting. The shirts contained an insignia relating to a measure appearing on the ballot and were clearly associated with a political campaign encouraging Houston residents to vote in favor of Proposition B. The email Ostrewich brings forth was sent in response to complaints lodged by citizens throughout the City of Houston. This suggests that many election judges agreed that the shirts were prohibited under the statute. It also indicates that voters were complaining and that people in positions of power were listening. Where Ostrewich sees evidence of haphazard enforcement, I see evidence that the discretion of election judges is constantly monitored and reined in by a system of checks and balances.

The election judge had clear authority to order Ostrewich to change her shirt under section 61.010. That provision is constitutional under *Mansky* because it limits the election judge's authority to prohibit only those "badge[s], insignia[s], emblem[s], or other similar communicative device[s]" that relate "to a candidate, measure, or political party appearing on the ballot." TEX. ELEC. CODE § 61.010(a). This provision was reasonably applied to Ostrewich.

### 2. Ostrewich's facial challenge to section 61.010 fails.

Generally, "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *U.S. v. Raines*, 362 U.S. 17, 21 (1960). However, where a regulation infringes on the right to free speech, it may be challenged "by showing that it substantially abridges the First Amendment rights of other parties not before the court." *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S.

620, 634 (1980). First Amendment rights may be threatened by overly broad or impermissibly vague laws. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

> ### a.   Section 61.010 is not overbroad.

Although section 61.010 was constitutional as applied to Ostrewich, she may still lodge a facial attack under the First Amendment overbreadth doctrine. *See Bd. of Airport Comm'rs*, 482 U.S. at 574. *See also Grayned*, 408 U.S. at 114 ("Because overbroad laws, like vague ones, deter privileged activity, our cases firmly establish appellant's standing to raise an overbreadth challenge."). A statute is overbroad "if it prohibits a substantial amount of protected speech . . . relative to the statute's plainly legitimate sweep." *U.S. v. Williams*, 553 U.S. 285, 292 (2008).

Section 61.010 is not overbroad because it contains language limiting its scope to political apparel "relating to a candidate, measure, or political party appearing on the ballot." TEX. ELEC. CODE § 61.010(a). To repeat, section 61.010 only prohibits Texans from wearing expressive apparel within a polling place if the sentiment being expressed relates to a candidate, measure, or political party appearing *on the ballot*. This is an important limitation. Ostrewich points to the deposition testimony of several election judges who stated that the statute prohibits apparel discussing past candidates for president and apparel expressing support for organizations such as the National Rifle Association and Black Lives Matter. According to Ostrewich, this testimony demonstrates that the statute's application sweeps far too broadly and captures too much protected speech. I disagree. At best, this testimony establishes that the individual election judges either do not understand the statute or that they have been improperly trained on its application. This does not establish that the statute's plain language is too broad. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973) (To declare a statute overbroad, "the overbreadth of [the] statute must not only be real, but substantial as well."); *Grayned*, 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language. The words of the Rockford

ordinance are marked by 'flexibility and reasonable breadth, rather than meticulous specificity.'" (quotation omitted)). The language of section 61.010 does not sweep too broadly because it is limited to expressions related to candidates, measures, or political parties appearing on the ballot.

> **b.     Section 61.010 is not vague.**

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. art. XIV, § 1. The Supreme Court has held that "the Due Process Clause prohibits the Government from 'taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'" *Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). In contexts such as the one presented here, where "behavior as a general rule is not mapped out in advance on the basis of statutory language[,] . . . perhaps the most meaningful aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith v. Goguen*, 415 U.S. 566, 574 (1974). The Fifth Circuit has "held that a state's legislative enactment is void for vagueness under the due process clause of the Fourteenth Amendment if it is inherently standardless, enforceable only on the exercise of an unlimited, and hence arbitrary, discretion vested in the state." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (cleaned up).

Section 61.010 is directed at people "in the polling place or within 100 feet of any outside door through which a voter may enter the building in which the polling place is located." TEX. ELEC. CODE § 61.010(a). It targets people who have gathered at a government-designated spot at a government-designated time to perform a civic task—vote. Its restrictions extend no further. Section 61.010 is further limited to prohibit only the wearing of "a badge, insignia, emblem, or other similar communicative device relating to a candidate, measure, or political party

31

appearing on the ballot." *Id.* By limiting its reach to issues appearing on the ballot, the Texas law provides fair notice of what is expected of people gathered in and around the polling place on election day and during early voting. *See Grayned*, 408 U.S. at 112 (noting that an ordinance written for a specific context "gives fair notice to those to whom it is directed" (cleaned up)). Local residents gathering at a polling place to vote are likely more informed about what appears on their ballots than even state-level authorities, like the Secretary of State. In fact, Ostrewich herself testified she understood that she was being asked to cover her yellow firefighter T-shirt because "there was a firefighter measure on the ballot, Proposition B." Dkt. 74-1 at 13.

For the same reason, section 61.010 is also capable of reasonable enforcement. Election judges generally serve in the precincts where they reside. This means that they will be more familiar with what candidates, measures, and political parties are appearing on a local ballot. All the election judges deposed in this case were familiar with the yellow firefighter T-shirt and its connection to a campaign by firefighters to obtain pay parity with police officers.

In her briefing to this Court, Ostrewich charted responses gathered during the depositions of several election judges that she contends demonstrate confusion and a lack of clarity about how to enforce section 61.010. *See* Dkt. 74 at 20. Ostrewich contends that this chart demonstrates the inability to apply section 61.010 reasonably. The question before me, however, is not whether this or that individual election judge understands the law they are supposed to enforce. The question before me is whether the statute is capable of being reasonably applied, *see Mansky*, 138 S. Ct. at 1891, and the answer to that question is yes.

Under *Mansky*, a statute is capable of reasonable application and enforcement if it provides objective and workable standards to reign in the discretion of the individuals responsible for enforcing the statute. *See id.* The statute here does just that. It is objective because it narrows the scope of prohibited content to an objectively verifiable question—what candidates, measures, and

32

political parties are appearing on the ballot? It then authorizes election judges to exercise their discretion in determining whether a piece of apparel "relates" to that candidate, measure, or political party. The fact that some amount of discretion is involved is not unreasonable in and of itself. *See id.* (acknowledging that "some degree of discretion in this setting is necessary").

Section 61.010 provides the outer limits of an election judge's discretion. For apparel to be banned within the designated area, it must (1) relate to a candidate, measure, or political party, and (2) that candidate, measure, or political party must appear on the ballot. This is a workable standard. The Supreme Court has warned against "expect[ing] mathematical certainty from our language" and recognized that laws "marked by flexibility and reasonable breadth, rather than meticulous specificity" can still pass constitutional muster. *Grayned*, 408 U.S. at 110 (quotation omitted). Election judges are trained on how to enforce this statute by both state and local authorities, and state and local authorities continue to issue guidance on enforcement during election season. The discretion of election judges does not go unchecked. Complaints are fielded by county clerks and the Secretary of State who issue informal advisories to the boots on the ground. *See* Dkt. 74-4 at 39 (Sonya Aston email).

As I mentioned, the question is not whether a couple of election judges answered hypothetical questions differently during depositions. The two questions before me are (1) whether the people to whom the statute applies have fair notice of what the statute prohibits and (2) whether the statute provides objective and workable standards to guide the discretion of election judges. The answer to both questions is yes. Section 61.010 is not impermissibly vague on its face. This conclusion is buttressed by *Mansky* where the Supreme Court directly cited section

61.010 as "proscribing displays (including apparel) in more lucid terms" than the Minnesota statute. *Mansky*, 138 S. Ct. at 1891 (alteration in original).[9]

## B.   SECTIONS 61.003 AND 85.036

Because the election judge had some constitutional basis for prohibiting Ostrewich from wearing her shirt under section 61.010, I need not address whether the election judge could have also banned her shirt under sections 61.003 and 85.036. *See Bowen v. United States*, 422 U.S. 916, 920–21 (1975) (admonishing district courts and courts of appeals to avoid reaching constitutional questions unnecessarily); *Faulk v. Union Pac. R. Co.*, 449 F. App'x 357, 363 (5th Cir. 2011) ("It is a basic tenet of American jurisprudence that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (quotation omitted)). However, Ostrewich's chilling injury remains—an election worker might ban Ostrewich's firefighter T-shirt in the future, or she might be criminally investigated and charged during a future election even if no firefighter measure is on the ballot. *See* TEX. ELEC. CODE §§ 61.003, 85.036.

As noted earlier, § 85.036 provides:

(a)   During the time an early voting polling place is open for the conduct of early voting, a person may not electioneer for or against any candidate, measure, or political party in or within 100 feet of an outside door through which a voter may enter the building or structure in which the voting polling place is located.

* * *

(f)   In this section:

* * *

(2)   "Electioneering" includes the posting, use, or distribution of political signs or literature.

---

[9] Because I have determined that there was a constitutional basis for prohibiting Ostrewich from wearing her T-shirt at the polling place during the 2018 election, Ostrewich's claim for nominal damages against Hudspeth and Ogg fails as matter of law. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (nominal damages are unavailable where a plaintiff has failed to establish a past, completed injury).

*Id.* § 85.036.[10] To determine whether Ostrewich's T-shirt might be subject to sections 61.003 and 85.036 in the future, I must first ensure that "Electioneering" also includes political apparel.

No Texas court has construed sections 61.003 and 85.036, and there is no official administrative guidance on how to interpret and apply these provisions. *Cf. Mansky*, 138 S. Ct. at 1889 (using Minnesota's Election Day Policy from 2010 as the "authoritative guidance" on how to construe the state statute at issue there). I am also unable to certify the question to the Texas Supreme Court. *See* TEX. CONST. art. V, § 3-c (limiting jurisdiction to questions certified by federal appellate courts). I must, therefore, make an *Erie*-guess as to how a Texas court might construe the statutes at issue here. *See Doe I v. Roman Catholic Diocese of Galveston-Houston*, No. H-05-1047, 2006 WL 8446968, at *4 (S.D. Tex. Mar. 27, 2006).

The parties agree that sections 61.003 and 85.036 apply to apparel, like Ostrewich's T-shirt. *See* Dkt. 76 at 10 (explaining that sections 61.003 and 85.036 "cover any form of electioneering, including any electioneering communicated via apparel"); Dkt. 87 at 22–23 ("Section 61.003(a)(2) prohibits electioneering of any kind, including the kind of electioneering at issue in this case *and* 'the posting, use, or distribution of political signs or literature.'" (emphasis added)). The Secretary of State's Election Advisory No. 2020-19 takes the position that the prohibition against electioneering in sections 61.003 and 85.036 "applies to clothing and accessories worn by the voter." Dkt. 85-1 at 105. I see no reason to reach a different conclusion.

Sections 61.003 and 85.036 prohibit voters from "electioneer[ing] for or against any candidate, measure, or political party." TEX. ELEC. CODE §§ 61.003(a)(2), 85.036(a). The statutes then define electioneering to include "the

---

[10] Sections 61.003 and 85.036 are, essentially, carbon copies of each other. Section 61.003 applies only on election day. Section 85.036 applies during the early voting period. The operative wording in both statutes is identical. Any ruling I make with respect to section 85.036 applies with equal force to section 61.003.

posting, use, or distribution of political signs or literature." *Id.* §§ 61.003(b)(2), 85.036(f)(2). But electioneering is not limited just to the posting, use, or distribution of political signs or literature; it also includes apparel that stumps "for or against any candidate, measure, or political party." *Id.* §§ 61.003(a)(2), 85.036(a). Unlike section 61.010, these provisions are not limited to candidates, measures, or political parties appearing *on the ballot*. Moreover, sections 61.003(b)(2), 85.036(f)(2) provide that electioneering includes political signs and literature, which suggests that these statutes allow election judges to ban voters from wearing "political" apparel. This is problematic.

Like the Minnesota statute at issue in *Mansky*, sections 61.003 and 85.036's use of the term "political" is unmoored from any objective, workable standard that an election judge could use to reasonably apply the statute. And unlike section 61.010, sections 61.003 and 85.036 do not have language limiting their application to those candidates, measures, or political parties appearing *on the ballot*. This means that an election judge could prohibit Ostrewich from wearing her yellow firefighter T-shirt in future elections under sections 61.003 and 85.036, even if there is no firefighter issue on the ballot. Ostrewich has no way of knowing whether the election judge at her polling place would consider the shirt to be political. She also does not know if the shirt would be banned as electioneering for a measure, even though the specific measure (Proposition B) is not on the hypothetical ballot. Sections 61.003 and 85.036 do not give Texas voters notice of what is expected of them in the polling place, and they do not provide election judges with objective, workable standards to reign in their discretion. This is impermissible under the First Amendment and these statutory provisions should be struck down as unconstitutional.

## CONCLUSION

For the reasons provided above, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part, and Plaintiff's Motion for Summary Judgment **GRANTED** in part and **DENIED** in part. Specifically, I

recommend that Ostrewich's challenge to section 61.010 of the Texas Election Code be denied, and that her request for nominal damages be denied. However, I recommend that sections 61.003 and 85.036 be struck down as unconstitutional infringements on the First Amendment right to free speech.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections under Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 14th day of September 2021.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE